```
 1                  UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3    UNITED STATES OF AMERICA,        )
                                       )
 4         Plaintiff,                  )  No. 15-CR-1928-LAB
                                       )
 5              v.                     )  June 20, 2016
                                       )
 6    NICOLE KISSANE,                  )  10:36 a.m.
                                       )
 7         Defendant.                  )  San Diego, California
      _____)

 8

 9             TRANSCRIPT OF SENTENCING - CONTINUED
            BEFORE THE HONORABLE LARRY ALAN BURNS
10                 UNITED STATES DISTRICT JUDGE

11    APPEARANCES:

12    For the Plaintiff:       UNITED STATES ATTORNEYS OFFICE
                               By:  JOHN N. PARMLEY, ESQ.
13                                  MICHAEL F. KAPLAN, ESQ.
                               880 Front Street
14                             San Diego, California  92101

15    For the Defendant:       FEDERAL DEFENDERS OF SAN DIEGO, INC.
                               By:  JOHN C. ELLIS, ESQ.
16                                  REUBEN CAHN, ESQ.
                               225 Broadway
17                             San Diego, California  92101

18
      Court Reporter:          CYNTHIA R. OTT, RDR, CRR
19                             District Court Clerk's Office
                               333 West Broadway, Suite 420
20                             San Diego, California, 92101
                               cynthia_ott@casd.uscourts.gov
21

22

23

24

25    Reported by Stenotype, Transcribed by Computer
```

1          SAN DIEGO, CALIFORNIA, JUNE 20, 2016, 10:36 A.M.

2                              * * * *

3          THE COURTROOM DEPUTY:  Calling number two on the

4   calendar 15-CR-1928, United States of America versus Nicole

5   Kissane.  Counsel, state their appearances, please.

6          THE COURT:  Good morning.

7          MR. ELLIS:  Good morning, Your Honor.  John Ellis and

8   Reuben Cahn, Federal Defenders, on behalf of Nicole Kissane.

9   She's present before the Court on bond.

10          MR. CAHN:  Good morning, Your Honor.

11          THE COURT:  All right.

12          MR. PARMLEY:  John Parmley and Michael Kaplan for the

13   United States.  Good morning.

14          THE COURT:  All right.  Good morning.  This matter is

15   on for sentencing today assuming the Court accepts the plea

16   agreement in the case, is that correct?

17          MR. ELLIS:  Yes, Your Honor.

18          THE COURT:  I have read, in preparation for the

19   proceeding today, the presentence report, objections to the

20   presentence report and addendum that responds to the

21   objections.  A sentencing memo on behalf of Ms. Kissane,

22   attached to that are exhibits, which included letters from

23   family members and others who know her.  It included a report

24   from a psychologist.  Looked at the sentencing summary charts,

25   actually the one filed by the United States.  There's a joint

1    recommendation here for six months.  Was there anything else I

2    should have reviewed?

3          THE COURT:  No, Your Honor.

4          MR. CAHN:  I think the government also filed a

5    sentencing memorandum.  I'm not sure if you mentioned that or

6    not.

7          MR. KAPLAN:  We did.

8          THE COURT:  Yes, I'm sorry, I did read that too.  I

9    have it here.  The question is whether the Court will accept

10   the 11(c)(1)(c).  This is a binding plea agreement, which means

11   if I accept the plea agreement I must impose the sentence the

12   parties have agreed to.  I'm happy to hear from you, but my

13   inclination is not to accept it.  The government has asked me

14   to impose a sentence below the guidelines, even with

15   substantial concessions and a charge bargain being given to the

16   defendant.

17         You know, the consummate act of sentencing discretion

18   is for the Court to decide that a departure or a variance is

19   warranted and, here, I just can't say that.  In fact, if

20   anything, I think it would be an abuse of discretion to find a

21   further variance from the guidelines.

22         So I understand what the rules are.  Under Ellis, I

23   respect the charge bargain that the government has entered

24   into, that's their prerogative, but Ellis makes very clear that

25   the exercise of sentencing discretion is up to me.  And the

1    request for me to vary from this case, I find not indicated by

2    the facts.  In fact, I'm a little perplexed because, as I look

3    to this, the government has kind of agreed with defense that

4    the heavy in this was the other fellow that I sentenced earlier

5    and I never heard any of that when that fellow was presented.

6         The government never came forward and told me, oh,

7    he's really the bad one.  Part of his culpability in this case

8    is he suckered poor Ms. Kissane, you know, into all this.  More

9    generally, Mr. Ellis, you know, I've looked at the kinds of

10   sentences that are available for this.  I mean under Kuhn, I'm

11   to use my day-to-day experience in sentencing.  And I'm to look

12   at other guidelines cases that are similar and the way that

13   they're sentenced.

14        Well, we don't have a lot of vandalism cases.  I did a

15   survey, there's some, there's people who vandalized in national

16   parks, they get six months.  You know, a second or third time

17   graffiti vandal in Los Angeles maybe gets six months.  This is

18   way, way different.  This is a campaign of terror against an

19   industry that goes multistate, involves great planning, and

20   coordination by the defendants.

21        I know you dispute, you know, the background that led

22   to the financing of this, but I'm convinced that from looking

23   at the probation report and the evidence that Ms. Kissane was

24   involved in substantial other criminal activity to finance

25   this, the stealing of items and selling them on eBay.  I know

1    that the other fellow was involved primarily in this, but she

2    was part and parcel with that.  And then I'm asked to impose

3    what amounts to like a misdemeanor sentence for this?  I can't

4    in good conscience do that.

5            So I'm happy to hear from you, but I'm inclined to

6    reject this.  I don't want my name on this.  I'm not going to

7    put my imprimatur on it, which is what I'm being asked to do.

8    If I accept the charge bargain or the plea bargain here, then I

9    have to impose that sentence and that's not a sentence that I

10   would impose in this case.

11           But before I make a final decision and give her the

12   chance to withdraw her plea, I'll be happy to hear from you if

13   I've missed something.

14           MR. CAHN:  Judge, let me start by saying a couple of

15   things.  First, the Court mentioned a charge bargain and I

16   understand the Court is referring to the plea bargain, but I

17   want to be clear, there's been no charge bargain in this

18   instance.  Ms. Kissane has pled guilty to the sole charge in

19   the indictment, which was the conspiracy to violate the Animal

20   Enterprise Terrorism Act.

21           And the guidelines you're looking at, the guidelines

22   that call for a 12 to 18-month sentence are, in fact, the

23   guidelines applicable to the offense that she committed.  Now

24   we can argue about whether or not those are appropriate under

25   the circumstances, whether the Commission made a good choice or

1   not, but they are, in fact, the relevant guidelines.

2           You know, Your Honor, I think we've laid out the

3   reasons we think this is an appropriate sentence in the -- in

4   the memorandum, but I'd like to spend a little bit of time

5   talking about them and ask that -- in asking that you

6   reconsider your preliminary judgment.

7           And I should probably start by saying this, before I

8   go on, because I'll tell you, Nicole is not completely happy

9   with us.  We've laid out in the agreement the circumstances

10  that we think led to this offense and those include her unique

11  susceptibility and the influence of the codefendant.

12          But Nicole was very much of the judgment that she did

13  wrong and she wants to take responsibility for what she did and

14  really didn't want us to talk about anyone other than her.  So

15  I say that as a preface to what I'm going to say.  You know, at

16  first I think Nicole has to be looked at in the context of the

17  sentence given to her codefendant and his role in the offense.

18          And the one thing that absolutely everyone in this

19  courtroom who knows about the case, who knows about the

20  relative roles agrees upon is that Nicole simply wouldn't be

21  here were it not for her codefendant.  That she has a long

22  history of involvement in the animal rights movement, but

23  always and strictly lawful protest, which is obviously not only

24  protected but really is in the tradition of what we expect in

25  this country that people express their views in these lawful

1    means.

2           And it was only once she fell in with this individual,

3    and he really began to take control of her life in a way that

4    extends not just to this particular activity but well beyond

5    that.  And you see in some of the documents we've submitted the

6    breadth of that control, the way in which he wouldn't even

7    allow her to use her own car, in which he would tell her where

8    to go and what to do, that he really exercised just

9    extraordinary control over her.  You know, I think Your Honor

10   has spent enough time both with your experience in state court

11   as well as in federal court, has seen these sort of

12   relationships where one individual can really sort of take

13   control of and dominate another.  And I think that's the single

14   most relevant factor here.

15          I think the other factors to remember, of course,

16   Nicole's background, her support.  She has in the courtroom a

17   large group of family members and I'll -- her mother is here,

18   her aunt is here, other supporters are here.  Her background is

19   one of really -- and I don't know any other way to put this,

20   than a good kid.  You know, she grew up, she worked hard going

21   through school, she grew up in a single parent household, did

22   everything she could to make life easier for her mom.  That's

23   set out in the sentencing letter that her mom sent.

24          She's worked hard her whole life, unlike

25   Mr. Buddenberg, the codefendant, if you look, and probation

1    verifies this, she has a work record that shows she's been

2    working essentially from the time she got out of school

3    nonstop.

4         And so when you talk about there were other means of

5    support for this criminal effort, I think that may be true, but

6    whatever was done by Nicole, as opposed to Mr. Buddenberg, was

7    really under his direction.  And I say that because you look at

8    even during this time Nicole was working nonstop, other than

9    when they were on these trips.  She worked at the hairdressers.

10   She worked at Jimbo's here.  She worked at Whole Foods.  She's

11   been working up to now and trying to go back to school as well.

12        So you really see and I think one of the things that

13   that shows is that this is a person not just who never would

14   have been involved in criminal activity before but never will

15   be involved in criminal activity again because that's not who

16   she is.  She's not somebody who's engaged over the course of

17   her life in a slew of petty crimes and was working up to this.

18        She's not somebody who seeks to harm other people.

19   And that's another thing I want to emphasize.  Nicole, I don't

20   think when she was, you know, influenced into this really

21   considered in a meaningful way the harm that this did to other

22   people and how it made them feel.  I remember talking to her

23   about the fact that these were real people who had homes and

24   that the one place we want to feel safe is in our homes and

25   that that had been taken away.

9

1          And I remember her reaction to that.  It's one of the

2    things that makes me say that this is a person who really,

3    really will never be in front of this court or any other court

4    again, that it's just not who she is.  And so I recognize this

5    is an extraordinarily low sentence for this conduct because

6    this isn't a single act of graffiti or even a few acts of

7    graffiti, real people were harmed.  And Nicole recognizes that

8    as well.

9          THE COURT:  It's more than that, Mr. Cahn.  As I said,

10   it's the other criminal activity that helped to support the

11   trips.  And I know Mr. Ellis has filed an objection to say,

12   well, you can't prove she stole this item or that item.  My

13   sense of things is she was involved in the repeated theft of

14   items from places like RER and CBC and all of these places, and

15   then the items were then sold on eBay to finance this trip.

16          We're not talking about a single discrete objective

17   here, we're talking about a criminal objective that had

18   tentacles that led to other crimes.  Six months really?

19   Really.  I mean is that really what the government thinks?

20   There's no prospect here that she's ever going to be able to

21   pay back the restitution amount that's agreed to.  In fact,

22   there's been an objection that I not set it at 500, that she

23   can only pay a hundred.  She faces 36 months of supervised

24   release on this, that's $3600 if she pays off, you know, 1

25   percent of the restitution, Mr. Cahn.  So, I mean, there's 10

1    different ways that this recommendation makes no sense.

2           The part that's most offensive to me is I'm being

3    told, you must exercise your discretion to come down from the

4    guidelines and impose a guideline -- a less than guideline

5    sentence.  You must depart here.  I would never do that looking

6    at this.  I mean, that's just not where my judgment and the

7    experience that you mentioned takes me.  And I resist that.

8           I don't like that it comes in an 11(c)(1)(c).  If you

9    want to make your arguments to me, fine, and I'll consider

10   them.  But to say, you know, I have to do this, I don't.  I

11   mean, the truth is I don't have to do this.

12           MR. CAHN:  Obviously, you don't.  Even in a c)(1)(c)

13   plea the ultimate authority is up to Your Honor.  And, of

14   course, when we filed our papers, the papers didn't say you

15   must accept this plea.  The argument was all about why we think

16   this is a just and appropriate sentence.

17           THE COURT:  No, I get that.

18           MR. CAHN:  Because we respect the Court's role.

19           THE COURT:  No one has been disrespectful, I don't

20   mean it that way, but it's so far afield from what strikes me,

21   you know, even the low end of a reasonable sentence.  I don't

22   want to go any further because I don't want to be accused of

23   trying to restructure any deal that might be made.  That's not

24   my prerogative.  If she wants a trial, she can go to trial.

25           What's salient here to me is that there's no

1    indication from the government of any proof problem here.  If

2    they had to prove the case, they would go to trial.  Okay,

3    might involve subpoenaing people from, you know, different

4    places.  It might be an expensive proposition.  You know,

5    prosecuting crimes doesn't come cheaply.

6           Enforcing the law doesn't always come cheaply, but

7    that doesn't mean that I'm going to weigh it and give everybody

8    a slap on the wrist.  And that's what this amounts to.

9           MR. CAHN:  Well, Judge, we did not address questions

10   of the problems with the government's case in our memorandum

11   because it was not what this was about.  It was about whether

12   or not this was a just and appropriate sentence and we chose to

13   focus on it.

14          Now I can't say whether the government thinks they'll

15   have problems.  We think we have defenses.  I think probably

16   the bigger issue is not so much the proof at trial but really

17   the problems with the statute.  And I don't want to spend a lot

18   of time going into them, but the government's aware of the

19   motions we were going to file.  This particular charge is

20   highly problematic, because as the Court knows from the trial

21   memorandum the government served, that it requires no more than

22   an agreement, travel and interstate commerce with the intent to

23   harm the industry.

24          And, of course, with that, without the limitations

25   that exist in the substantive offenses under the statute, there

1    really is a First Amendment overbreadth problem which can

2    scarcely be overcome without essentially rewriting the statute

3    and importing other elements into the conspiracy count.

4           And the government's aware of that and they're aware

5    of the motions we were going to file.  There were a lot of

6    motions, and I think that was one part of their consideration,

7    but I don't think it was the main part.  And I really do think

8    the main part was the judgment -- I don't want to speak for

9    them, they can speak for themselves -- really was who is

10   Nicole, what did she do, what's necessary for deterrence,

11   what's necessary for punishment, and what's the best outcome

12   under the circumstances when you take into account the role

13   that her codefendant played.

14          And that's why none of us has spent any time focusing

15   on these other aspects because we didn't think they were most

16   relevant to your consideration.

17          THE COURT:  You know, actually I feel a little

18   buffeted by what you're saying.  I don't know how it came out

19   that they weren't sentenced on the same day or I didn't get any

20   of the material on this defendant where essentially everyone is

21   pointing the finger at the codefendant as the heavy, because

22   that was certainly not the government's position when they came

23   in and asked me to go along with the 24 months.  I was

24   reluctant with that fellow.

25          And I feel -- and I'm not accusing anybody of

1   anything, I don't know if it was deliberate, but I feel a

2   little misled by that.  The way it comes out is that guy

3   deserved a much longer sentence than the one the government

4   gave him, essentially gave him because it was another

5   11(c)(1)(c) plea and I had to go along with it if I accepted

6   it.

7          And I was reluctant at the time.  I heard from one of

8   the victims.  I explained to her that, you know, if I accepted

9   this I had to go along with it, I had no discretion even though

10  I disagreed with it at the time.  And I didn't know the half of

11  it.  I didn't know that the government said, oh, well, he

12  really pressed her into service here.  He was the heavy on all

13  this.  I don't know why they didn't tell me that at the time in

14  the interest of full disclosure.

15         MR. CAHN:  Judge, let me -- I wasn't here for the

16  sentencing and so I can't speak to exactly what was said.  I do

17  know because, obviously, I reviewed the agreements that

18  Mr. Buddenberg was a guideline sentence even though it was an

19  11(c)(1)(c).  And I can say the reason we asked for a

20  continuance -- and we asked for it, not the government -- is

21  that we felt there was no way to put a full picture of Nicole

22  in front of you without the additional information that was

23  supplied in the psychological report.

24         And, frankly, finding a competent and not

25  extraordinarily outrageously priced psychologist in San

1    Francisco who was willing to work with us and interview Nicole

2    and spend really substantial time with her, because we didn't

3    want somebody who had done a drive-by evaluation talking to

4    you, we needed that time.  And so that's on me, it's not on the

5    government.  They shouldn't take the blame for that.

6             THE COURT:  Okay.  I'll accept that.  As I said, I'm

7    not accusing anybody of misleading me, I'm just saying that the

8    circumstances that I'm now aware of are very different from

9    those that I was made aware of at the time Buddenberg was

10   sentenced.

11            MR. CAHN:  And, you know, to the extent to which we're

12   responsible for that, I apologize to the Court.  It certainly

13   was never our intent.

14            THE COURT:  You don't have to.  You owe me no apology

15   for that.  You did what you needed to do on behalf of your

16   client and I accept the explanation.  And it led to a

17   consequence that I'm not real happy with, but no one intended

18   that consequence.  So anything else, Mr. Cahn?

19            MR. CAHN:  Can I have one moment, Your Honor, just to

20   speak to Mr. Ellis?

21            THE COURT:  Sure.

22            MR. CAHN:  I don't think I have anything further on

23   the acceptance of the agreement, Your Honor.

24            THE COURT:  Mr. Kaplan, Mr. Parmley, I'm happy to hear

25   from you before I make the final decision.

```
 1              MR. PARMLEY:  I appreciate that, Your Honor.  I think
 2   the less I speak in these hearings is probably for the best.
 3              THE COURT:  Well, it's not personal.  I don't want to
 4   make it seem like it's personal.  I like and respect both of
 5   you, all four of you as a matter of fact.  I just disagree with
 6   the judgment that's made here.
 7              MR. PARMLEY:  That's certainly your right, Your Honor.
 8   The only thing I would add, I think Mr. Cahn echoed this, is
 9   that we certainly didn't try to hide anything about
10   Mr. Buddenberg.  He received, and I know the Court disagreed
11   with it, a low-end sentence.
12              THE COURT:  Well, particularly now, particularly,
13   Mr. Parmley, I disagree with it in light of, you know,
14   everything that's come to light.
15              MR. PARMLEY:  I understand.
16              THE COURT:  I'm being told here's a person being told
17   what to do directed by him, that this is the heavy in the whole
18   thing.
19              MR. PARMLEY:  That information came to us a little bit
20   later.
21              THE COURT:  That came what?
22              MR. PARMLEY:  A little bit later when we received that
23   report.
24              THE COURT:  Oh, after Buddenberg was sentenced.
25              MR. PARMLEY:  That was helpful to us.  Yes.
```

1          MR. CAHN:  I don't think they knew the extent of --

2          THE COURT:  Okay.  Well, all right.

3          MR. CAHN:  Because I think we had hinted at them, but

4   really I didn't know fully until, you know, I mean you've been,

5   you learn some things talking to your clients, but sometimes

6   the full story doesn't come out when they're talking to a

7   lawyer.  We talk like lawyers.

8          THE COURT:  All right.

9          MR. PARMLEY:  I don't have anything else to add, Your

10  Honor.  Thank you.

11         MR. CAHN:  We don't get information the same way.

12         THE COURT:  Well, I'll accept all of that and, again,

13  let me say I'm not recriminating anybody here.  I'm just -- at

14  the end what this comes down to for me is if I do this, it's

15  antithetical to the exercise of discretion.  A departure or

16  variance is really the exercise of discretion.  I varied today

17  on cases, taking into consideration circumstances.  Mr. Ruan's

18  client got 40 months less, 31 months less, something like that,

19  because there were circumstances.

20         Here my judgment would take me in the other way if I

21  were to vary, honestly it would.  And I'm not saying

22  necessarily that I would vary upward, but I certainly wouldn't

23  vary downward here.  That's not my exercise of discretion.

24         So the question is, you know, shall I accept this and

25  then be forced to do that?  I just don't think so.  I just

1    don't.  Six months is not proportionate to the harm that was

2    done here.  I don't think it's in the interest of the

3    community.  I think it sends a terrible signal, honestly,

4    terrible signal.

5          I mean, this isn't the first instance of vandalism or

6    costly property loss by virtue of the animal rights movement.

7    It's not.  We know about arson and other things that have

8    happened.  And so we send out a case, you know, with someone

9    that's responsible, admittedly, for 350, $360,000 worth of

10   damage over a three-month campaign that involved interstate

11   travel and we say, we're going to fix your wagon, we're going

12   to give you six months for that.  Not me.  That's not the

13   message that I'm sending.

14         So I appreciate the additional comments, but I'm not

15   moved and I can't in good conscience go along with this.  The

16   course available to the district court on rejecting the plea

17   agreement is to advise the defendant of her rights.

18         You have the right, Ms. Kissane, to withdraw your

19   guilty plea and to proceed to trial.  I don't want to give you

20   a message that I have it out for you, I don't.  I'm not hostile

21   to you.  I just disagree with what they're asking me to do,

22   which is to exercise discretion to go, you know, outside of the

23   guidelines and impose a six-month sentence.

24         So it's not personal at all even with you, but that

25   just doesn't seem to me in the interest of justice and it

1  doesn't seem proportionate to what happened here.  I don't

2  think it promotes respect for the law as I look at the 3553

3  factors.

4       Mr. Cahn asked me to consider, you know, whether it

5  was appropriate punishment, and we may have a disagreement

6  about that.  I think we probably do.  I don't think it is.  So

7  those are the reasons I reject it.

8       Here are your options.  You can maintain your plea if

9  you want, understanding that I'm not bound by the agreement, if

10 you do, or you can withdraw your plea and proceed to trial or

11 proceed to have the motions heard in the case and to go

12 forward.

13      Rather than put you on the spot and have you make that

14 decision today, I think what I'll do is put this over for two

15 weeks and you can confer.  And if you want to come back and she

16 can inform me of her decision at that time and I'll set

17 additional dates as appropriate.  Is that agreeable?

18      MR. CAHN:  Thank you, Your Honor.  That's agreeable.

19      MR. PARMLEY:  That would be fine.  Your Honor.

20      MR. CAHN:  Thank you for listening to us on this

21 issue.  I knew we might not see eye to eye so.

22      THE COURT:  I want to emphasize to everyone here, I'm

23 not mad at anybody.  I'm not personally mad at Ms. Kissane.

24 I'm not mad at the prosecutors, but, you know, the idea that I

25 would sentence proportionate with, as I said, a third time

1   graffiti vandal in east Los Angeles, I'm not doing that.

2   That's not what this case is about.  It's not like that.  It's

3   way worse than that in my judgment.

4        Tish, if you'll give us a date a couple weeks out.

5        MR. CAHN:  Judge, I just want to make sure you know to

6   the extent to which there is any blame for information not

7   having been in front of the Court prior to today, that's on me.

8   It's not on anyone else.

9        THE COURT:  It's not a matter of blame.  You've

10  explained what the circumstances were.  You were endeavoring to

11  get a reasonable expert to look at it.  I mean, honestly as I

12  read this, I thought, well, this was a very different picture

13  of Buddenberg than the one that was presented by the

14  prosecutors.  But now I accept what's been said.  Maybe they

15  didn't have the full information on his culpability.  If they

16  had, maybe they wouldn't have made such a lenient deal with

17  him.

18        But, you know, I feel like I made a mistake on that

19  case now, frankly, having read all this, but the arrow has left

20  the bow.  There's nothing I can do on that except not repeat

21  the same mistake.

22        Tish, give us a date.

23        THE COURTROOM DEPUTY:  July 5th.

24        THE COURT:  July 5th at 9:30.  If you'll return here

25  at that time.

1          MR. ELLIS:  Under the circumstances, will the Court

2  exclude time between today and July 5th in the interest of

3  justice?

4          THE COURT:  Sure, sure.

5          MR. PARMLEY:  Thank you, Your Honor.

6     (The proceedings concluded at 11:00 a.m., June 20, 2016.)

1                    COURT REPORTER'S CERTIFICATE

2

3       I, CYNTHIA R. OTT, Official Court Reporter, United States

4    District Court, Southern District of California, do hereby

5    certify that pursuant to 28 U.S.C. §753 the foregoing is a

6    true, complete and correct transcript of the stenographically

7    reported proceedings had in connection with the above-entitled

8    matter and that the transcript page format is in conformance

9    with the regulations of the Judicial Conference of the United

10   States.

11

12          DATED at San Diego, California, June 28, 2016.

13

14                            _____/s/ CYNTHIA R. OTT_____
                              CYNTHIA R. OTT, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25