**John C. Ellis, Jr.**
California State Bar No. 228083
**Reuben Camper Cahn**
California State Bar No. 255158
**Federal Defenders Of San Diego, Inc.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
John_Ellis@fd.org
Reuben_Cahn@fd.org

Attorneys for Ms. Kissane

United States District Court

Southern District Of California

**(Honorable Larry A. Burns)**

| United States Of America, | Case No.:  15CR1928-LAB |
|---|---|
| Plaintiff, | |
| V. | **Memorandum Of Points Of Authorities In Support Of Motion** |
| Nicole Kissane, | |
| Defendant. | |

## INTRODUCTION

Defendant Nicole Kissane moves to dismiss the indictment charging her with conspiracy to violate the Animal Enterprise Terrorism Act ("AETA" or "the Act"), 18 U.S.C. § 43(a)(2)(C), because the Act is substantially overbroad. The Government agrees that the plain language of the AETA's conspiracy provision requires only an agreement to travel in interstate commerce for the purpose of disrupting the operations of an animal enterprise; the provision requires neither an agreement to damage property nor an agreement to threaten to do so. Thus, simply speaking out against an animal enterprise with the intent of reducing the enterprise's profit margin could make one liable for domestic terrorism under the Act. These plain terms make the reach of the statute grossly overbroad on its face. Even if this Court reads the conspiracy provision more narrowly, the statute's criminalization

of causing loss of an animal enterprise's personal property is independently overbroad. Under either reading of the statute, this Court should grant the instant motion and dismiss the indictment against Ms. Kissane.

**ARGUMENT**

## I.   MS. KISSANE HAS STANDING TO BRING A FACIAL CHALLENGE TO THE AETA

The AETA is invalid on its face because it infringes on freedom of speech and association. *See, e.g.*, *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926) (criminal statute infringing on speech and association rights invalid on its face); *see also United States v. Perelman*, 695 F.3d 866 (9th Cir. 2012), *U.S. v. Schales,* 546 F.3d 965, 970-73 (9th Cir. 2008). Because Ms. Kissane is being prosecuted under the Act, she has standing to challenge the statute facially.

## II.   THE AETA IS SUBSTANTIALLY OVERBROAD

The overbreadth doctrine protects individuals who "may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 521 (1972). A facial challenge lies where there is a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court," *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984), a "substantial risk that application of the provision will lead to the suppression of speech," *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998), or the "arguably impermissible applications of the statute amount to more than a tiny fraction of the materials within the statute's reach," *New York v. Ferber*, 458 U.S. 747, 773 (1982). Criminal statutes challenged for overbreadth must be examined particularly carefully. *City of Houston v. Hill*, 482 U.S. 451, 459 (1987).

The AETA is overbroad in two distinct respects. First, the AETA's conspiracy provision, subsection (a)(2)(C), is overbroad because it punishes any

interstate travel undertaken "for the purpose of damaging or interfering with the operations of an animal enterprise," without requiring the conspiracy to cause the loss of property or a threat.  18 U.S.C. § 42(a)(2)(C).  Moreover, the provision has no *actus reus*: it prohibits having a particular purpose and causing a particular effect, but it fails to define the specific conduct that is unlawful.  Thus, the conspiracy provision criminalizes pure speech so long as the jurisdictional hook of interstate travel is satisfied.

Second, the AETA's property-loss provision, subsection (a)(2)(A), is overbroad.  To begin with, like subsection (a)(2)(C), (a)(2)(A) applies to pure speech.  Moreover, it prohibits damaging or causing the loss of *any* property without prohibiting a particular criminal act.  Because "property" as commonly defined includes money and intangibles, this provision makes it a federal crime to engage in speech that causes a business to spend money or lose profit.  Finally, like (a)(2)(C), there is no element of *actus reus* in the property-loss provision.  Thus, like (a)(2)(C), (a)(2)(A) applies to pure speech uttered with the particular purpose and effect of interfering with an animal enterprise.  This sweeps in too much protected speech.

In short, the two subsections make it a federal crime to conspire to engage in speech that opposes an animal enterprise or to engage in speech that causes such a business to spend money or lose profit.  And while the AETA does have a rule of construction purporting to limit its application to "expressive conduct," a general First Amendment exception cannot save a statute so vastly overbroad as this.

**A.** **The conspiracy provision of the AETA is substantially overbroad because it punishes as an act of domestic terrorism mere agreement to travel interstate for the purpose of damaging or interfering with an animal enterprise**

> 1. <u>The plain language and structure of the AETA make it a crime to agree to travel interstate for the purpose of damaging or interfering with the operations of an animal enterprise</u>

The first step in overbreadth analysis is to interpret the challenged statute. *See United States v. Stevens*, 559 U.S. 460, 474 (2010).  The interpretation of a statute, in turn, begins with the plain meaning of the statute's terms.  *See United States v. Shill*, 740 F.3d 1347, 1351 (9th Cir. 2014).

The AETA provides that whoever:

> (a) Travels in interstate or foreign commerce, or uses or causes to be used the mail or any facility of interstate or foreign commerce—
>
> (1) for the purpose of damaging or interfering with the operations of an animal enterprise; and
>
> (2) in connection with such purpose --
>
>> (A) intentionally damages or causes the loss of any real or personal property (including animals or records) used by an animal enterprise, or any real or personal property of a person or entity having a connection to, relationship with, or transactions with an animal enterprise;
>>
>> (B) intentionally places a person in reasonable fear of the death of, or serious bodily injury to that person, a member of the immediate family (as defined in section 115) of that person, or a spouse or intimate partner of that person by a course of conduct involving threats, acts of vandalism, property damage, criminal trespass, harassment, or intimidation; or
>>
>> (C) conspires or attempts to do so;
>
> shall be punished as provided for in subsection (b).

18 U.S.C. § 43(a).

The plain terms of the statute show that subsection (a)(2)(C) criminalizes a conspiracy to engage in the acts and purpose set out in (a)(1).  In other words, the Act makes it a crime simply to conspire to 1) travel in interstate commerce 2) for the purpose of damaging or interfering with the operations of an animal enterprise.  No more is required to violate the Act's prohibition.  This is so because (a)(2)(C)'s conspiracy offense is included as one of three entire separate offense descriptions, joined together by the disjunctive "or." This disjunctive structure requires each subsection be given independent application.  So, (a)(2)(C) is operative without regard to the terms of either (a)(2)(A) or (a)(2)(B).  Thus, just as threats under (a)(2)(B) do not require any damages to property under (a)(2)(A), a conspiracy under (a)(2)(C) similarly stands alone as a basis for criminal liability.  In other words, the conspiracy criminalized under the Act is an agreement to  travel interstate with the purpose of damaging or interfering with an animal enterprise under (a)(1), not a conspiracy to damage property under subsection (a)(2)(A) or to threaten injury under subsection (a)(2)(B).

Consistent with this plain reading, the Government in its Preliminary Trial Memorandum stated that "[t]he elements of a violation of . . . (a)(2)(C) . . . are:

1.     There was an agreement between at least two persons:
    a.     to travel in interstate or foreign commerce;
    b.     for the purpose of damaging or interfering with the operation of an animal enterprise;
2.     The defendant became a member of the conspiracy knowing of one of its objects and intending to help accomplish it; and
3.     The offense resulted in more than $100,000 in damages (increases the statutory maximum to 10 years.)

*See* Dckt. No. 60, p. 21.[1]

---

[1]  Elements 1 and 2 apply to all conspiracy charges under (a)(2)(C).  The third element will vary depending on the penalty sought; for example, section 43(b)(1)(A) allows for a conviction even if the offense results in no economic damage.

The structure of other federal criminal statutes further supports the Ms. Kissane's and the Government's reading.  Other statutes criminalizing attempt and/or conspiracy either (1) include the attempt/conspiracy language in each subsection of the statute,[2] (2) include a separate attempt/conspiracy subsection explicitly identifying other subsections it incorporates,[3] or (3) have attempt/conspiracy language separate and apart from the list of subsections of offenses and separated by "or," thus indicating that the conspiracy/attempt language applies to all subsections in the list.[4]  Each of the above three methods are clear in their text and structure as to how attempt or conspiracy operates *vis-a-vis* other

---

[2] *See, e.g.*, 18 U.S.C. § 247(a) ("Whoever . . . (1) intentionally . . . destroys any religious real property . . . , or attempts to do so; or (2) intentionally obstruct . . . any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so; shall be punished . . . ."); *accord* 18 U.S.C. §§ 33, 81, 175, 248, 609, 793, 794, 832, 836, 924, 930, 1203, 1204, 1262, 1362, 1363, 1365, 1368, 1470, 1505, 1512, 1513, 1791, 1951, 1959, 2071, 2118, 2119, 2153, 2154, 2155, 2241, 2251, 2260, 2275, 2332, 2385, 2388, 2421, 2422, 2423, 2425, 2339(a), 2339A, 2339B.

[3] *See, e.g.,* 18 U.S.C. § 32(a) ("Whoever willfully – (8) attempts or conspires to do anything prohibited under paragraphs (1) through (7) of this subsection"); *accord* 18 U.S.C. §§ 38, 351, 831, 1201, 1751, 1831, 1832, 2280, 2281, 2291, 2332B, 2332F, 2339C.

[4] *See*, *e.g.*, 18 U.S.C. § 37:

(a) Offense. – A person who unlawfully and intentionally, using any device, substance, or weapon—

(1) performs an act of violence against a person at an airport . . . that causes or is likely to cause serious bodily injury . . . or death; or
(2) destroys or seriously damages the facilities of an airport . . . ,

if such an act endangers or is likely to endanger safety at that airport, or attempts or conspires to do such an act, shall be [penalized] . . . .

*See also* 18 U.S.C. §§ 1091, 1466A, 1512, 1513, 2241, 2242.

sections of the statute.   The structure of the AETA employs none of these conventions.

In short, as the Government agrees, the conspiracy provision must be interpreted as criminalizing "[using interstate commerce] for the purpose of damaging or interfering with the operations of an animal enterprise; and in connection with such purpose conspir[ing] or attempt[ing] to do so."  18 U.S.C. § 43(a)(1); (a)(2)(C).  So interpreted, the provision is substantially overbroad.

2.   <u>The statute is substantially overbroad because subsection (a)(2)(C) criminalizes conspiracy to "interfer[e]" with an "animal enterprise"</u>

Subsection (a)(2)(C) is substantially overbroad because it makes it a domestic-terrorism offense to conspire to travel interstate for the purpose of "interfering" with the operations of an "animal enterprise" as set forth in (a)(1). The statute thus criminalizes agreements to engage in the ordinary exercise of pure speech against a near-limitless array of organizations, institutions, and businesses.

When a statute does not define a term, the term must be interpreted according to its "ordinary, contemporary, common meaning." *Shill*, 740 F.3d at 1351 (internal quotation marks and citation omitted).   Here, the AETA does not define "interfering" as it appears in subsection (a)(1).  Therefore, the dictionary definition should be applied.  *See Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485-86 (1996) (interpreting "imminent" by beginning with dictionary definition); *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992) (applying dictionary definition to resolve plain meaning of "exclusive").  Black's Law Dictionary defines "[i]nterference" as "[t]he act of meddling in another's affairs" or "[a]n obstruction or hindrance." BLACK'S LAW DICTIONARY (10th ed. 2014).   Relying on a different dictionary definition, the Ninth Circuit has concluded that "[t]o 'interfere' is to 'oppose, intervene, hinder, or prevent.'" *United States v. Willfong*, 274 F.3d 1297, 1301 (9th Cir. 2001) (citing WEBSTER'S NEW WORLD DICTIONARY 704 (3d College ed. 1998)).  This plain meaning of the term covers pure speech as well as expressive

conduct such as picketing, protesting, leafleting, boycotting, and other protected speech. *See Hill*, 482 U.S. at 455, 457 (ordinance designed to prevent interference with police officers overbroad because it could result in arrests for "arguing, talking, . . . failing to remain quiet, refusing to remain silent, verbal abuse, cursing, verbally yelling, talking loudly, [and] walking through scene.") (internal quotation marks and alterations omitted).

The sweep of the term "interfering" is made all the more clear when contrasted to the other verb in (a)(1), "damaging." Black's Law Dictionary defines "damage" as "[l]oss or injury to person or property." BLACK'S LAW DICTIONARY 445 (9th ed. 2009); *see also* MERRIAM-WEBSTER COLLEGIATE DICTIONARY 314 (11th ed. 2003) (defining "damage" as "loss or harm resulting from injury to person, property, *or reputation*.") (emphasis added). The ordinary meanings of the two terms thus distinguish "damaging" from "interfering." Moreover, "[i]t is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words." *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003). Here, Congress presumably intended to convey a different meaning for "damaging" than for "interfering." Thus, consistent with their common meanings and to avoid superfluousness, we presume that "interfering" means meddling with or obstructing an enterprise's operation in a manner that does *not* "cause[] loss or injury" to the operation.

The Supreme Court recognized decades ago that while speech has the power to "interfer[e]" with or damage business operations, it cannot be proscribed on that basis. *See Thornhill v. Alabama*, 310 U.S. 88, 99-100 (1940). *Thornhill* involved a facial challenge to a statute prohibiting picketing a place of business "for the purpose of hindering, delaying or interfering with any lawful business or enterprise of another." *Id.* at 91. The Court held that the statute "sweeps within its ambit . . . activities that in ordinary circumstances constitute an exercise of freedom of speech

. . . [and] results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview." *Id.* at 97-98.  The Court reasoned that violation of the law could "be proved merely by showing that others reacted in a way normally expectable of some upon learning the facts of a dispute" with the target business.  *Id.* at 100.  The Court determined that although the expression encompassed by the statute might well harm business interests, "the danger of injury to an industrial concern is neither so serious nor so imminent" as to allow such a sweeping proscription.  *Id.* at 105*; see also Hill*, 482 U.S. at 455, 463-64 (ordinance criminalizing "interfering with policemen" "prohibits speech that in any manner interrupts an officer.  The Constitution does not allow such speech to be made a crime.") (internal quotation marks and alterations omitted); *United Bhd. of Carpenters & Joiners of Am. Local 586 v. NLRB*, 540 F.3d 957, 966 (9th Cir. 2008) (holding unconstitutional rule designed to restrict speech that "would interfere with normal business operations"); *Dorman v. Satti*, 862 F.2d 432, 436-437 (2d Cir. 1988) (statute prohibiting "interfer[ing]" with or "harass[ing]" hunters unconstitutionally overbroad), *Hirschkop v. Snead,* 594 F.2d 356, 371 (4th Cir. 1979) (Virginia Code of Professional Responsibility prohibition on statement "reasonably likely to interfere with a fair trial" overbroad and vague); *Nitzberg* v. *Parks,* 525 F.2d 378, 383 (4th Cir. 1975) (school ban on distribution of literature likely to lead to "substantial disruption of or material interference with school activities"  overbroad).

The conspiracy provision's proscription of "interfering" speech is similarly overbroad.  Like the statute at issue in *Thornhill*, the provision criminalizes "nearly every practicable, effective means whereby those interested . . . may enlighten the public" on the subject at hand.  *Thornhill*, at 310 U.S. at 104.  *Every single time* an animal rights group plans a multistate or national protest, it would violate this federal law, as such protests are undertaken for the purpose of hindering a business's profits or reputation and hindering its ability to continue to exploit

MOTION TO DISMISS INDICTMENT FOR OVERBREADTH

animals.  A peaceful sidewalk picket outside a fur store is intended to interfere with that business—the purpose is to persuade the public to not patronize the store and to shame those who do.  A letter to a company threatening to boycott their products unless they cease testing on animals also is intended to interfere with that business. Because the conspiracy provision's criminalization of "interfering" includes so vast an array of free speech activity, the statute is unconstitutional on its face and cannot stand.

The conspiracy provision is overbroad for a second reason:  its use of the term "animal enterprise."  Unlike the term "interfering," the statute defines "animal enterprise."  The problem is that it defines it so broadly that it includes businesses and organizations with even a tangential relationship to animals.

Subsection (d)(1) of the AETA defines "animal enterprise" as:

> (A) a commercial or academic enterprise that uses or sells animals or animal products for profit, food or fiber production, agriculture, education, research, or testing;
> (B) a zoo, aquarium, animal shelter, pet store, breeder, furrier, circus, or rodeo, or other lawful competitive animal event; or
> (C) any fair or similar event intended to advance agricultural arts and sciences[.]

This definition includes any retail stores that make or sell clothing; automobile makers and dealers, as well as other entities that use and sell leather products; grocery stores, restaurants, and gas stations that sell food; schools and universities; and innumerable other commercial enterprises as well as non-profit organizations that in some way maintain, use, or sell animals or animal products.  Thus, by definition, a person could be convicted under this terrorism statute for "interfering with an automobile manufacturer because it failed to disclose internal safety reports about faulty engineering that put the public's safety in jeopardy, and the interference caused the manufacturer to lose $10,000 in lost profits or consumer good will."  Michael Hill, *United States v. Fullmer and the Animal Enterprise*

*Terrorism Act: "True Threats" to Advocacy*, 61 Case W. Res. L. Rev. 981, 1026 (2011).  "Likewise, a person who interferes with a clothing manufacturer's plans to relocate to South America violates AETA if that interference causes" economic damages of more than $10,000.  *Id.*  As these examples show, the AETA's expansive definition of "animal enterprise" sweeps in far too much speech to pass constitutional muster.

3.    The penalty provisions do not rescue subsection (a)(2)(C) from overbreadth, as they are independently overbroad

The penalty provisions of the AETA further highlight the overbreadth of the conspiracy provision.  A person can be criminally punished for conspiracy under the AETA even when their purpose of interfering with a business *never results* in "economic damage" to the business.  And even when "economic damage" does result, the statute's definition of that phrase means that lawful picketers could be convicted for losses caused by an unrelated third party or for any security measures undertaken by the business that is ostensibly in response to the picket.  Because these penalty provisions themselves are overbroad, they cannot rescue the conspiracy provision of the statute from overbreadth.

The AETA's liability provisions (including the conspiracy provision), set forth in section (a), work in tandem with its penalty provisions, set forth in section (b).  One of the penalty provisions—subsection (b)(1)(A)—concerns conspiracies that result in no economic damage or bodily injury.  *See* 18 U.S.C. § 43(b)(1)(A).  Thus, Ms. Kissane could be convicted of domestic terrorism under the AETA for alleged overt acts 27-29 alone (leaving the Bay Area, traveling to the Midwest, parking and sleeping there, and then returning to the Bay Area).  Indictment, Dckt. # 1, at 6.  More specifically, according to the Government's Pretrial Memorandum, this trip allegedly consisted of (1) traveling across state lines, (2) parking a few miles away from an Iowa "chicken and egg factory" and thirty miles away from a mink farm that had been identified in documents later seized from Ms. Kissane's

mother's house, (3) sleeping at a rest stop in Minnesota and acting "purposefully evasive" when questioned by an officer there, and (4) returning home to the Bay Area. *See* Dckt. # 60, at 11-12. These alleged acts alone would have been enough to charge and convict Ms. Kissane of a domestic-terrorism offense.

Moreover, even when the conspiracy provision is coupled with penalty provisions requiring economic damage, it is substantially overbroad. *See* § 43(b)(1)(B), (b)(2)(A), (b)(3)(A). The AETA defines economic damage broadly, as, *inter alia*:

> the loss of profits, or increased costs, including losses and increased costs resulting from threats, acts of vandalism, property damage, trespass, harassment, or intimidation taken against a person or entity on account of that person's or entity's connection to, relationship with, or transactions with the animal enterprise.

18 U.S.C. § 43(d)(3)(A). Economic damage, however,

> does not include any lawful economic disruption (including a lawful boycott) that results from lawful public, governmental, or business reaction to the disclosure of information about an animal enterprise.

18 U.S.C. § 43(d)(3)(B). Notably, subsection (d)(3)(B)'s caveat on "economic damage" does not exempt all protected protest activity, but rather premises exemption on the *lawful* reaction of third parties.

This broad definition of "economic damage" creates liability for damages caused by third-party actions whose relation to the defendants may be extremely attenuated. For example, let's say that activists organize an anti-fur picket at a fur store, and during the protest they disclose information about abuse of animals at fur farms. If a third party then reacts to that information by entering the fur store and splashing paint on fur coats, this would qualify as economic damage for which the *activists* would be held liable. Similarly, if one business were to unlawfully break a contract with another business as a result of activist pressure, subsection (d)(3)(B) would not exempt the activists' activity. The same result would apply if activist

pressure led to a government divestment that was later deemed unlawful. *Cf.* *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 366 (2000) (declaring unconstitutional a state law restricting authority of state agencies to purchase products from companies doing business with Burma).

Similarly, increased costs that result from public, governmental or business reaction to information-disclosure qualify as economic damage. For example, if an animal enterprise chooses to hire additional security in the face of a peaceful and lawful picket on a public sidewalk across the street from enterprise headquarters, economic damage has occurred sufficient to make the picketers culpable as domestic terrorists.

In short, the breadth of the plain terms of the conspiracy provision cannot be overstated. For this reason, the entire conspiracy and attempt provision must be struck down as overbroad.

### B.  The conspiracy provision is substantially overbroad even if it is read to reference subsections (a)(2)(A) and (a)(2)(B) instead of (a)(1)

Even if the Court were to disagree with both the Government and Ms. Kissane that the plain meaning of the subsection (a)(2)(C) conspiracy provision refers back to (a)(1), and instead interprets the provision to refer back to the property-loss subsection, (a)(2)(A), Ms. Kissane's indictment still must be dismissed because (a)(2)(A) also is overbroad.[5]  Specifically, because (a)(2)(A) makes it an act of domestic terrorism to engage in speech that causes an animal enterprise or anyone even remotely affiliated with an animal enterprise to lose money or increase business expenses, it encroaches far too much on the First Amendment to pass constitutional muster.

---

[5]  There is no allegation that Ms. Kissane conspired to threaten under subsection (a)(2)(B). Thus, aside from the general challenge to any interpretation of (a)(2)(C) that references (a)(2)(A) and (a)(2)(B), set forth *supra* in Section A of this motion, this motion does not challenge (a)(2)(B).

1.   <u>Subsection (a)(2)(A) prohibits causing an animal enterprise or any person or entity having a connection to, relationship to, or transaction with an animal enterprise to spend money or lose profit</u>

Subsection (a)(2)(A) outlaws damaging or causing the loss of "*any . . .* personal property" of an animal enterprise or of "a person or entity having a connection to, relationship with, or transactions with an animal enterprise." 18 U.S.C. § 43(a)(2)(A).  Black's Law Dictionary defines "personal property" as "[a]ny moveable or *intangible* thing that is subject to ownership and not classified as real property."  BLACK'S LAW DICTIONARY (10th ed. 2014).   Under this definition, money and profit are both property. *Accord* 18 U.S.C.A. § 2114(a) ("A person who assaults any person having lawful charge . . . of *any money or other property* of the United States, with intent to rob, steal, or purloin such mail matter, money, or other property of the United States . . . shall, for the first offense, be imprisoned not more than ten years).  Indeed, when Congress means to protect *only* tangible property, it does so explicitly:  In over thirty different criminal and non-criminal statutes, Congress has specifically referred to "tangible personal property" rather than just personal property.[6]

_____

[6] *See, e.g.*, 4 U.S.C. § 107(a) (relating to taxation of property sold by United States); 7 U.S.C. § 941(c) (relating to taxation of Rural Telephone Bank); 7 U.S.C. § 3318(d) (relating to grants by Department of Agriculture); 11 U.S.C. § 541(b)(8) (relating to property in bankruptcy); 11 U.S.C. § 722 (relating to bankruptcy redemption); 12 U.S.C. § 1464(c)(2)(C) (relating to activity of federal savings associations); 12 U.S.C. § 1768 (taxation of federal credit unions); 12 U.S.C. § 2290(a) (taxation of Federal Financing Bank); 15 U.S.C. § 78kkk(e) [*sic*] (taxation of SIPC); 15 U.S.C. § 381(a)(1) (property subject to income tax); 15 U.S.C. § 2301(1) (defining consumer product); 15 U.S.C. § 6611(a)(2) (relating to tort damages in Y2K actions); 18 U.S.C. § 1513(b) (criminalizing causing damage or threatening damage to "tangible property of another person" for the purpose of preventing testimony of a witness at an "official proceeding"); 19 U.S.C. § 81o(e) (relating to ad valorem taxation); 22 U.S.C. § 2697(d) (relating to acceptance of gifts on behalf of the United States); 26 U.S.C. § 48(a)(5)(D) (relating to energy tax credit); 26 U.S.C. § 48C(c)(2) (relating to energy project tax credit); 26 U.S.C. § 110(c)(3) (relating to construction allowances); 26 U.S.C. § 144(a)(12)(C) (relating to tax exemption for qualified bonds); 26 U.S.C. § 168 (relating to depreciation of property); 26 U.S.C. § 170(a)(3) (relating to charitable deductions); 26 U.S.C. § 199(c)(5) (relating to calculation of income); 26 U.S.C. § 263A(b)(1) (relating to

Thus, under the plain meaning of its terms, subsection (a)(2)(A) prohibits causing a business to spend money or lose profit.  And this is exactly how the provision has been interpreted.  The Third Circuit in *United States v. Fullmer*, 584 F.3d 132 (3d Cir. 2009), determined that the predecessor law to the AETA criminalized causing increased business costs or the loss of profit or increased business costs.   The Animal Enterprise Protection Act (AEPA) prohibited "intentionally caus[ing] physical disruption to the functioning of an animal enterprise by intentionally stealing, *damaging, or causing the loss of, any property (including animals or records) used by the animal enterprise*, and thereby caus[ing] economic damage exceeding $10,000 to that enterprise."  18 U.S.C. § 43 (a)(2) (2002) (emphasis added).   The defendants in *Fullmer* urged that the phrase "damaging, or causing the loss of, any property" should not be interpreted to include causing increased business costs or the loss of profit.  *See* 584 F.3d at 159. The Third Circuit disagreed, finding the property-loss element met because the evidence showed that the animal enterprise spent $15,000 on new computer software to better guard against future electronic civil disobedience campaigns.  *See id*; *see also United States v. Fullmer*, No. 06-4211, Appellee's Consolidated Brief at 37-38 (3d Cir. June 17, 2008) ("HLS had to purchase new hardware, new fire walls and additional software to combat the attack").  Moreover, while the Third

---

capitalization of certain expenses); 26 U.S.C. § 274(j)(3) (relating to employee achievement awards); 26 U.S.C. § 408(m)(2)(F) (defining "collectible" for tax purposes); 26 U.S.C. § 543(b) (relating to taxation of personal holding company income); 26 U.S.C. § 1298(d) (relating to special treatment of leased property); 26 U.S.C. § 1397C(d) (relating to definition of enterprise zone business); 26 U.S.C. § 2503(g)(2) (relating to tax treatment of certain gifts); 26 U.S.C. § 2522(e) (same); 26 U.S.C. § 6323(b) (relating to property subject to tax liens); 26 U.S.C. § 6334(a)(13) (relating to property subject to levying); 29 U.S.C. § 1302(g) (relating to taxation of Pension Benefit Guaranty Corporation); 31 U.S.C. § 6306 (relating to authority of agencies to vest title in certain property); 42 U.S.C. § 238(d) (relating to acceptance of gifts on behalf of United States by Secretary of Health and Human Services); 42 U.S.C. § 4622(a)(2) (describing losses eligible for payment when agency displaces business or farm operation).

MOTION TO DISMISS INDICTMENT FOR OVERBREADTH

Circuit declined to expressly decide whether causing profit-loss also would satisfy the property-loss provision, it identified profit-loss in a list of "loss[es] of property" in response to a different defense argument. *Id.* ("Defendants argue that the proper instruction would have required the jury to find that Defendants *actually caused* a "loss of property" in excess of $10,000 . . . ."  The Government presented ample evidence at trial that Defendants' protest activity directed at [the animal enterprise] actually caused [the enterprise] a loss well over $10,000 . . . electronic civil disobedience directed toward [the enterprise] cost the company $400,000 in lost business . . . .").

This interpretation of "property" is consistent with how a similar provision of a very different federal law has been interpreted.  The Price-Anderson Act governs liability-related issues for non-military nuclear facilities, partially indemnifying the nuclear industry against liability claims arising from nuclear incidents while also ensuring compensation coverage for the general public. *See generally* 42 U.S.C. § 2014.  Among many other provisions, the Act determines the law applicable to cases about "loss of, or damage to, or loss of use of property" caused by a nuclear incident.  42 U.S.C. § 2014(w).  In *Radiation Sterilizers, Inc. v. United States*, 867 F. Supp. 1465, 1469-70 (E.D. Wash. 1994), the court considered whether loss of profits, loss of customers, loss of goodwill, loss of access to operating cash and credit, loss of business opportunity and diversion of management time and resources amounted to "damage to . . . property" as described in the Act.  The court noted that some of this property is intangible, but held that it met the statutory provision anyway, as it has long been established in contract and tort law that a business's property includes intangibles such as profits and business goodwill. *See id.* at 1471.

Only one court has interpreted "any property" under (a)(2)(A) differently, but its reasoning was erroneous and this Court should not follow it.  In *United States v. Johnson,* No. 14-CR-390, 2015 WL 1058087, at *3-*4 (N.D. Ill. Mar. 25, 2015),

MOTION TO DISMISS INDICTMENT FOR OVERBREADTH

the court never discussed the plain meaning of "property" under (a)(2)(A).  Instead, the court focused only on the interaction between the AETA's liability and penalty provisions, sections (a) and (b), respectively.  *See id.*  The court reasoned that "specific inclusion of the defined term 'economic damage' in the penalties provision of the statute, but not in the offense conduct, indicates that Congress did not intend to criminalize conduct that solely causes economic loss as damage to property."  *Id.* at *5 (quoting *Bates v. United States*, 522 U.S. 23, 29-30 (1997) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.")).

This interpretation is erroneous, because a *Bates*-style statutory analysis only makes sense where Congress has employed the statutory term at issue in a way (here, "any personal property") that renders subsequent use of different terms (here, "economic damage") meaningful.  For example, in *Duncan v. Walker,* 533 U.S. 167, 173-74 (2001), the Supreme Court relied on *Bates* when interpreting the Antiterrorism and Effective Death Penalty Act's provision tolling the time for filing a habeas action while a properly filed "State post-conviction or other collateral review" is pending.  The habeas petitioner argued that "other collateral review" should be read to include *federal* habeas review, even though in several other sections of the statute Congress explicitly used the words "State or Federal" to denote the given provision's application to both of these types of proceedings.  *See, id.* at 172-73.  *Walker* held that it would be anomalous for Congress to use the words "State or Federal" repeatedly, and then deviate from this clear language with the phrase "State post-conviction or other collateral review", without meaning to exclude federal review.  *Id.* at 173-74.

In contrast, the AETA does not discuss "causing economic damage" and "damaging or caus[ing] the loss of any . . . personal property" in the same provision.  *Compare* 18 U.S.C. §§ 43(a)(2)(A) with 43(b).  By its plain meaning,

MOTION TO DISMISS INDICTMENT FOR OVERBREADTH

"caus[ing] the loss of any . . . property" is broad enough to include causing the loss of money or profit.  That such damage *also* counts as "economic damage" for penalty purposes presents no anomaly.  And because there is nothing about the structure of the statute to suggest that the broad phrase "personal property" should be interpreted otherwise, Congress' use of different language in the different provisions has no particular import.

Moreover, the *Johnson* court's interpretation would render Congress's use of the word "any" in "any . . . personal property" void.  To interpret "*any* personal property" to mean "only tangible property" would divest the word "any" of effect. *See Harrison v. PPG Indus.,* 446 U.S. 578, 589 (1980) (concluding "that the phrase, 'any other final action,' in the absence of legislative history to the contrary, must be construed to mean exactly what it says, namely, *any other* final action") (emphasis in original); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 221 (2008) ("Congress could not have chosen a more all-encompassing phrase than 'any other law enforcement officer'").  But it is "a cardinal principle of statutory construction" that a court must "give effect, if possible, to every clause and word of a statute." *Duncan,* 533 U.S. at 174 (citations omitted).  The *Johnson* court's analysis requires ignoring the word "any" altogether.

The *Johnson* court also misrelied on Congress's inclusion of the word "used," in the (a)(2)(A) phrase "*used* by an animal enterprise," to buttress its interpretation.  *See* 2015 WL 1058087, at *3; *see also* 18 U.S.C. § 43(a)(2)(A) ("intentionally damages or causes the loss of any real or personal property (including animals or records) *used* by an animal enterprise") (emphasis added). Under the *Johnson* court's reasoning, only tangible property is "used," so causing the loss of intangible property (like profit) doesn't meet the elements of (a)(2)(A). *See* 2015 WL 1058087, at *3.  This logic is flawed, and it would not save the statute from overbreadth regardless.  First, all the parties in *Johnson*, including the Government, agreed that money may be "used."  2015 WL 1058087, at *4.  Thus,

the *Johnson* court's analysis would require interpreting the phrase "causing the loss of property" to include causing a business to *spend money it already has*, but not losing profit to be gained.   Aside from being unnecessarily tortured, this construction still gives rise to a serious overbreadth problems as set forth *supra*. Second, the analysis ignores the rest of the sentence.   Subsection (a)(2)(A) addresses one who "intentionally damages or causes the loss of any real or personal property (including animals or records) used by an animal enterprise, *or any real or personal property of a person or entity having a connection to, relationship with, or transactions with an animal enterprise*."   18 U.S.C. § 43(a)(2)(A) (emphasis added).   The term "used" does not appear after the second reference to "real or personal property."   If "used" limits the definition of "personal property" in the first clause, then "personal property" would have to mean something different in each of the two clauses.   So construed, the AETA would protect only tangible property belonging to an animal enterprise, but all property belonging to a person or entity connected to, related to, or transacting with an animal enterprise.   This is illogical.

In sum, under the reasoning of *Johnson*, a substantive violation under (a)(2)(A) would require physical harm to tangible property—for example, breaking into a lab and releasing animals.   Ms. Kissane agrees that requiring physical harm to tangible property would make a better criminal statute.   But this is simply not the statute that Congress wrote. By its plain terms, the AETA outlaws damaging or causing the loss of "*any . . . personal property*" of an animal enterprise, including causing purely economic loss.

### 2.   The prohibition of causing a business to spend money or lose profit criminalizes a substantial amount of protected speech

With the proper interpretation of (a)(2)(A) established, the overbreadth of the subsection is clear:   virtually all effective advocacy by animal rights activists is prohibited.   As described *supra*, any activist who crosses state lines or uses the internet to organize a protest at an animal enterprise that results in the business

spending money or losing profit has violated the statute. On a larger and more mainstream scale, journalistic and documentary efforts could be criminalized as "domestic terrorism" offenses under the statute. For example, the recent documentary *Blackfish* meets all of the requirements for an AETA violation. The film levied sharp criticism at SeaWorld aquatic theme parks for its treatment of captive killer whales. SeaWorld, which uses captive animals for entertainment, is undoubtedly an animal enterprise. *See* 18 U.S.C. § 43(d)(1) (defining "animal enterprise"). The filmmakers' admitted "purpose" was to convince people to avoid patronizing SeaWorld's parks and ultimately affect their bottom line.[7] *See* 18 U.S.C. § 43(a)(1) (prohibiting using facility of interstate commerce to damage or interfere with the operations of an animal enterprise). And the resulting damage caused SeaWorld more than a billion dollars in lost profits, reduced market capitalization, and corrective expenditures.[8] *See* 18 U.S.C. § 43(a)(2)(A).

The overbreadth of the AETA has real consequences. On its face, the Act criminalizes picketing activity if the picketing is effective enough to close down a fur store.[9] Non-violent civil disobedience, like sitting down in front of the doors of

---

[7] *See* Austin Siegemund-Broka, *'Blackfish' Director Talks SeaWorld Revenue Drop: "People Are Truly Willing to Change Ethically"*, THE HOLLYWOOD REPORTER, Aug. 20, 2014, available at http://www.hollywoodreporter.com/news/blackfish-director-talks-seaworld-revenue-726447.

[8] The negative publicity from the film led SeaWorld to lose $925 million in market capitalization; SeaWorld also faced a securities class action lawsuit based on its failure to disclose potential liability related to the company's treatment of killer whales and the negative publicity resulting from the documentary. *See, e.g.*, Eriq Gardner, *SeaWorld Hit With Lawsuit Over Failure to Advise on 'Blackfish' Impact*, THE HOLLYWOOD REPORTER, Sept. 10, 2014, available at http://www.hollywoodreporter.com/thr-esq/seaworld-hit-lawsuit-failure-advise-731846. The company also announced a multi-million dollar expansion of its orca tanks in response to the negative publicity generated by the film. *See* Tony Perry, *Amid 'Blackfish' backlash, SeaWorld to expand orca environments*, LA. TIMES, Aug. 14, 2014, available at http://www.latimes.com/local/lanow/la-me-ln-seaworld-orca-plans-20140814-story.html.

[9] *See* Seth Prince and Spencer Heinz, *Activists Look Beyond Fur Shop's Move*, THE

a business, also is transformed under the Act from the state crime of obstruction to a federal crime of terrorism when it is performed by animal rights activists; and a raucous demonstration with a giant video screen showing primate experimentation outside an animal researcher's home would violate the AETA.[10]   Undercover investigators who work with local prosecutors and wear hidden cameras risk terrorism charges if their investigation focuses on a slaughterhouse.[11]  *See generally* 152 Cong. Rec. E2100-01 (Nov. 13, 2006) (statement of Hon. Steve Israel: "This bill criminalizes conduct that 'intentionally damages or causes the loss of any real or personal property,' however, the bill fails to define what 'real or personal property' means. As a result, legitimate advocacy -- such as a boycott, protest, or mail campaign -- that causes an animal enterprise to merely lose profits could be criminalized.").

Because the AETA fails to include any *actus reus*, its overbreadth cannot be eliminated by use of a limiting construction.  Subsection (a)(2)(A) fails to set forth the categories of conduct that constitute animal enterprise terrorism, instead punishing *any* interstate act (including speech) done for a broadly defined *purpose* (interfering with an animal enterprise) and having a broadly defined *effect* (causing damage or loss to such enterprise).  Reading an *actus reus* element into the statute (for example, by interpreting the AETA to prohibit *using force or violence* to damage or cause the loss of any personal property) or changing the language of the

---

OREGONIAN, Nov.30, 2006, at B2 (discussing the Act's prohibition of such activity).

[10] *See* Doug Erickson, *Protecting Researchers or Chilling Free Speech? Opponents and Animal Rights Activists Say the Law Goes Too Far, but Advocates Say it Gives Needed Protection*, WIS. STATE J., Nov. 26, 2006, at A1 (discussing the possibility that the Act would criminalize both actions).

[11] *See* Kim Severson, *Upton Sinclair, Now Playing on YouTube*, N.Y. TIMES, Mar. 12, 2008, at F1 (stating undercover investigators at slaughterhouses risked prosecution under the AETA).

provision to prohibit only "damaging or causing physical harm to tangible property" would be a "serious invasion of the legislative domain." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 479 n. 26 (1995).  A court may not "rewrite a . . . law to conform it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383, 397 (1988); *see also Erznoznik v. Jacksonille*, 422 U.S. 205, 216 (1975) (a court may not construe a statute narrowly to save it from overbreadth if the statute is "not readily susceptible to a narrowing construction.").

In sum, even if the Court holds that the conspiracy provision, subsection (a)(2)(C), refers back not to (a)(1) but to (a)(2)(A), the statute cannot be saved from constitutional infirmity; subsection (a)(2)(A) still is overbroad.  *See Smith v. California*, 361 U.S. 147, 151 (1959) ("the usual doctrines as to the separability of constitutional and unconstitutional applications of statutes may not apply where their effect is to leave standing a statute patently capable of many unconstitutional applications, threatening those who validly exercise their rights of free expression with the expense and inconvenience of criminal prosecution.").

## C.   The AETA's First Amendment "Rule Of Construction" does not cure its overbreadth

The AETA's First Amendment "rule of construction" cannot cure subsection (a)(2)(A) or (a)(2)(C)'s overbreadth.  Subsection (e)(1) directs that the AETA shall not be construed "to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment."   But the Supreme Court has made clear that "interfering" is ineluctably intertwined with expressive conduct, *see supra* at Section II.A.2, and the statute does not otherwise limit the term.  Because courts lack the authority to read "interfering" out of the statute, the savings clause can state nothing more than the basic proposition that a statute cannot override a constitutional right.

Moreover, there is ample case law holding that Congress cannot shield an unconstitutional statute from scrutiny simply by adding a First Amendment

exception that contradicts the broad sweep of its substantive provisions.  *See, e.g.,
Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 333 (4th Cir. 2001) (savings
clause could not save regulatory statute from a constitutional challenge because it
was "repugnant to the straightforward, limiting language of the respective statutory
provisions") (citing *Looney v. Com.*, 133 S.E. 753, 755 (Va. 1926)); *Fisher v. King*,
232 F.3d 391, 395 (4th Cir. 2000) (savings clause is disregarded as void when it is
inconsistent with the body of the statute); *CISPES (Comm. in Solidarity with the
People of El Sal.) v. FBI*, 770 F.2d 468, 474 (5th Cir. 1985) (savings clause "cannot
substantively operate to save an otherwise invalid statute"); *State v. Machholz*, 574
N.W.2d 415, 421 n.4 (Minn. 1998) (same); *Long v. State*, 931 S.W.2d 285, 295
(Tex. Crim. App. 1996) (same).[12]  If the reverse were true, then the following law
would be constitutional:  "[I]t shall be a crime to say anything in public unless the
speech is protected by the first and fourteenth amendment."  Laurence H. Tribe,
American Constitutional Law § 12-26, at 716 (1st ed. 1978).  This, established
precedent does not permit.

This precedent makes clear that a savings clause may operate, as it did in
*CISPES*, to validate one of *several competing constructions*, but it cannot change
the plain meaning of a statute's substantive provisions.  *See* 770 F.2d at 474.  As
shown above, (a)(2)(C)'s prohibition on interstate travel for the purpose of
damaging or interfering with an animal enterprise cannot be interpreted as anything
but a broad prohibition on speech opposing businesses that exploit animals, and
(a)(2)(A)'s focus on an individual who "damages or causes the loss of any real or
personal property" cannot legitimately be interpreted to mean one who "physically

---

[12] Relatedly, in *Holder v. Humanitarian Law Project*, 561 U.S. 1, 36 (2010), the
Court considered a First Amendment savings clause similar to the AETA's as
evidence of Congress's intent that a material-support statute would not violate the
First Amendment.  But despite the savings clause, the court nonetheless analyzed
the statute's substantive provisions and definitions to determine whether the
Constitution was violated.  *See id.* at 18-25.

damages any personal property except money or intangible property."  Where the only fair interpretation of the plain terms of a statute would penalize a substantial amount of protected speech, stating that the First Amendment will not be violated simply does not make it so.

Moreover, even if a well-drafted savings clause could operate to limit a statute's substantive reach, the AETA's broad First Amendment exception cannot dispel the plain sweep of the statute because it fails to clarify what is protected under the First Amendment and what is not.  The savings clause thus "trades overbreadth for vagueness." *State v. Moyle*, 705 P.2d 740, 748 n.12 (Or. 1985) (*en banc*); *see also Rubin v. City of Santa Monica*, 823 F. Supp. 709 (C.D. Cal. 1993) (First Amendment exception "beg[s] the question. What are protected activities and what are nonprotected activities? What does the First Amendment exception really mean?").  Laypersons cannot be presumed to understand what the First Amendment does and does not protect to the degree of certainty required for adequate notice in the criminal context. *See Long*, 931 S.W.2d at 295.  ("an attempt to charge people with notice of First Amendment caselaw would undoubtedly serve to chill free expression").  And it forces courts to "abandon[] scrutiny of the statute altogether for case-by-case adjudication." *Moyle*, 705 P.2d at 748 n.12;

Even taken at face value, the AETA's First Amendment exception covers only "expressive conduct," with no mention of other protected activity such as pure speech.  18 U.S.C § 43(e).  This leaves to the protestor the responsibility of determining what constitutes "expressive conduct," a question that has bedeviled Supreme Court Justices, to speak nothing of laypersons.  *See generally* John Greenman, *On Communication*, 106 MICH. L. REV. 1337, 1339-40 (May 2008) ("The law nominally protects acts that are 'expressive,' but rarely defines that word"). *Compare United States v. O'Brien*, 391 U.S. 367, 376 (1968) (conduct cannot "be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea"), with *Spence v. Washington*, 418 U.S. 405, 409 (1974)

(conduct is protected when it is "sufficiently imbued with elements of communication"), and *Virginia v. Black*, 538 U.S. 343, 360-61 (2003) (referring to "symbolic expression" and "symbolic conduct" as protected in some circumstances).  And the examples of "expressive conduct" provided in the Rules of Construction—"peaceful picketing or other peaceful demonstration"—only beg the question.  Much conduct is expressive and protected, even if it is not "peaceful." *See e.g., Brandenburg v. Ohio*, 395 U.S. 444, 446 n.1 (1969) (holding that a speaker's urging "revengeance" while others shouted "bury the [racial epithet]" is protected speech); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 902 (1982) (holding that threats by a civil rights leader that he would "break [the] damn neck" of anyone who frequented a "racist store[]" is protected).  Other expressive conduct, like civil disobedience, is widely recognized as a peaceful form of demonstration, but is not protected by the First Amendment.

At base, the AETA's Rule of Construction requires potential speakers to ignore the broad reach of the statute's substantive provision in favor of their own determination of what counts as expressive conduct and what kind of protest activity will be protected by the First Amendment. Will an animal rights activist who wants to place a flier outside a fur store condemning the store as filled with "[expletive] murderers" who "should be run out of business" rest easy that her speech should be safe from prosecution as "expressive conduct" comparable to a "peaceful demonstration," when it is more accurately described as aggressive pure speech that is clearly intended to cause the store a loss of profit and goodwill? Reasonable people will steer clear of advocacy that might be protected but that also may be close to the First Amendment line. *NAACP v. Button*, 371 U.S. 415, 433 (1963).  Thus, the savings clause only lends itself to unconstitutional vagueness while doing nothing to rein in the statute's unconstitutional overbreadth.

### D.     The AETA threatens to chill speech

The overbreadth of the AETA threatens to chill the freedom of speech and of the press that the First Amendment is designed to protect.  Indeed, the Act creates a prior restraint so severe that it threatens to freeze such speech altogether.  *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (prior restraint on speech is "the most serious and the least tolerable infringement on First Amendment rights"—it does more than "'chill[]' speech, . . . [it] 'freezes' it at least for a time.").

Even if prosecutions never or only infrequently result from a boycotting or leafleting campaign, the threat of prosecution is enough to deter people from engaging in politically motivated activity and to drive debate on animal-rights issues from the marketplace of ideas.  *See Button*, 371 U.S. at 433 (striking Virginia statute prohibiting solicitation of legal services because of its potential to cause individuals to avoid speech out of fear of prosecution).   For example, fearing criminal prosecution for a "terrorist" act, potential whistleblowers and others will "steer far wider" than if the scope of the law was clearly demarcated.  *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).  This is a serious, and an intolerable, infringement on core speech, and one that cannot constitutionally be allowed to stand.  Accordingly, this Court should hold the statute unconstitutionally overbroad, and dismiss the indictment against Ms. Kissane.

### CONCLUSION

For the foregoing reasons, the Court must dismiss the indictment against Ms. Kissane on the ground that the AETA is unconstitutional on its face.

Respectfully submitted,


Dated:  July 19, 2016                    */s/ John C. Ellis, Jr.*
                                         Federal Defenders of San Diego, Inc.
                                         Attorneys for Ms. Kissane
                                         Email:  John_Ellis@fd.org

## **CERTIFICATE OF SERVICE**

Counsel for the Defendant certifies that the foregoing pleading has been electronically served on the following parties by virtue of their registration with the CM/ECF system:

John N. Parmley
Assistant U.S. Attorney

Michael F. Kaplan
Assistant U.S. Attorney


Respectfully submitted,


Dated:  July 19, 2016

*/s/ John C. Ellis, Jr.*
Federal Defenders of San Diego, Inc.
Attorneys for Ms. Kissane
Email:  John_Ellis@fd.org

MOTION TO DISMISS INDICTMENT FOR OVERBREADTH