**John C. Ellis, Jr.**
California State Bar No. 228083
**Reuben Camper Cahn**
California State Bar No. 255158
**Federal Defenders Of San Diego, Inc.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
John_Ellis@fd.org
Reuben_Cahn@fd.org

Attorneys for Ms. Kissane

United States District Court

Southern District Of California

**(Honorable Larry A. Burns)**

| | |
|---|---|
| United States Of America,<br><br>Plaintiff,<br><br>v.<br><br>Nicole Kissane,<br><br>Defendant. | Case No.:   15CR1928-LAB<br><br>**Memorandum Of Points And Authorities In Support Of Defendant's Motion** |

The AETA violates substantive due process both on its face and as applied to Defendant Nicole Kissane's alleged conduct, because it punishes as an act of "terrorism" non-violent theft of private property.

**THE AETA'S PUNISHMENT OF PROPERTY DAMAGE AS A "TERRORIST" OFFENSE VIOLATES SUBSTANTIVE DUE PROCESS ON ITS FACE AND AS APPLIED TO MS. KISSANE'S ALLEGED CONDUCT**

As set forth in the Motion to Dismiss the Indictment for Overbreadth, the conspiracy provision of the Animal Enterprise Terrorism Act ("AETA" or "the Act"), 18 U.S.C. § 43, is unconstitutionally overbroad because it refers back only to subsection (a)(1).  However, even if this Court disagrees and finds that the provision refers back to subsection (a)(2)(A), the indictment must be dismissed because subsection (a)(2)(A) of the AETA violates substantive due process.

(Subsection (a)(2)(A) also is independently substantially overbroad and void for vagueness, and the indictment should be dismissed on these bases as well, as set forth in Ms. Kissane's companion motions.)  The provision includes no requirement of ideological motive, violence, or threat of violence. Yet, the AETA is a terrorism statute, passed "to provide the Department of Justice the necessary authority to apprehend, prosecute, and convict individuals committing animal enterprise *terror.*"  *Animal Enterprise Terrorism Act*, Pub. L.109-374, 120 STAT. 2652 (2006) (emphasis added). Because the conduct that the AETA prohibits cannot rationally be called terrorism, nor punished as an act of terrorism, the provision violates substantive due process both facially and as applied to Ms. Kissane.

## I.    History of the Act

The AETA was signed into law on November 26, 2006, and replaced the Animal Enterprise Protection Act of 2002 (AEPA). The legislative history makes clear that the AETA was passed in direct response to the activities of animal rights activists.  *See e.g.*, Introduction of the Animal Enterprise Terrorism Act of 2005, 151 Cong. Rec, E2276-02 (Nov. 4, 2005) (statement of Hon. Thomas Petri) (discussing threats posed by "animal rights extremists"); Statements on Introduced Bills and Joint Resolutions, 152 Cong. Rec. S9254-01 (Sept. 8, 2006) (statement of Hon. James Inhofe) (discussing actions by "extremist activists, acting in the name of animal rights"); Animal Enterprise Terrorism Act, 152 Cong. Rec. H8590-01 (Nov. 13, 2006) (describing "extremist elements among the animal rights groups").

The AETA makes it a federal crime to:

(a) Travel[] in interstate or foreign commerce, or use[] or cause[] to be used the mail or any facility of interstate or foreign commerce--
    (1) for the purpose of damaging or interfering with the operations of an animal enterprise; and
    (2) in connection with such purpose--
    (A) intentionally damage[] or cause[] the loss of any real or personal property (including animals or records) used by an animal enterprise, or any real or personal property of a person or entity having a connection to, relationship with, or transactions with an animal enterprise;
    (B) intentionally place[] a person in reasonable fear of the death of, or

1
2
3

> serious bodily injury to that person, a member of the immediate family…
> of that person, or a spouse or intimate partner of that person by a course
> of conduct involving threats, acts of vandalism, property damage,
> criminal trespass, harassment, or intimidation; or
>      (C) conspire[] or attempt[] to do so[.]

4   18 U.S.C. § 43(a).

5         The earlier AEPA defined the offense more narrowly.  The AEPA made it a

6   crime to "intentionally cause[] physical disruption to the functioning of an animal

7   enterprise by intentionally stealing, damaging, or causing the loss of, any property

8   (including animals or records) used by the animal enterprise, and thereby cause[]

9   economic damage exceeding $10,000 to that enterprise, or conspire to do so."  18

10  U.S.C. § 43(a) (2002).

11        Ms. Kissane is charged with the conspiracy prong of the AETA, section

12  (a)(2)(C).  As set forth in the Motion to Dismiss for Overbreadth, the parties agree

13  that this prong criminalizes any conspiracy to violate section (a)(1)—that is, a

14  conspiracy to travel interstate for the purpose of damaging or interfering with the

15  operations of an animal enterprise.  *See* Mot. to Dismiss for Overbreadth, at 5; *see*

16  *also* Indictment, Dkt. No. 1.  This provision is unusual in comparison to other

17  criminal statutes in its omission of a specific *actus reus*.  There is no single category

18  of conduct that constitutes "terrorism" under the conspiracy provision.  Instead,

19  animal enterprise terrorism under section (a)(1) means *any* interstate act (including

20  speech) that is done for a broadly defined *purpose* (interfering with an animal

21  enterprise), and has a broadly defined *effect* (damaging or interfering with such

22  enterprise).[1]  "Animal enterprise" is also defined extremely broadly to include

23  effectively any entity that uses animals or animal products in any way.  18 U.S.C.

24  § 43(d)(1).

25

26  [1] Even if, contrary to the plain language and structure of the Act, the indictment
    could be read to criminalize conspiracy to violate the property damage prong of the
27  AETA (section (a)(2)(A)) it still make it a terrorism offense to engage in a broad
    array of boycotting and otherwise lawful protest actions that cause an animal
    enterprise to spend money or lose profit.  *See* Mot. to Dismiss for Overbreadth, at
28  14-23.

Penalties under the AETA depend on the amount of "economic damage" and/or bodily injury that result from the substantive violation. *Id.* at § 43(b). Economic damage is broadly defined, as, *inter alia*, "the loss of profits, or increased costs, including losses and increased costs resulting from threats, acts or vandalism, property damage, trespass, harassment, or intimidation taken against a person or entity on account of that person's or entity's connection to, relationship with, or transactions with the animal enterprise," excluding "any lawful economic disruption (including a lawful boycott) that results from lawful public, governmental, or business reaction to the disclosure of information about an animal enterprise." *Id.* at § 43(d)(3). Because Ms. Kissane is charged with causing economic damage in excess of $100,000, she faces up to ten years in prison.

Substantive due process "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *United States v. Juvenile Male*, 670 F.3d 999, 1012 (9th Cir. 2012) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Where non-fundamental liberty or property rights are involved, substantive due-process claims require a showing that the law in question bears "no reasonable relation to a legitimate state interest." *Juvenile Male*, 670 F.3d at 1012 (*citing Washington v. Glucksberg*, 521 U.S. 702, 722, (1997)). Ms. Kissane makes this showing here: because she has a liberty interest in avoiding the label of "terrorist," and because this label serves no rational purpose in this context, the AETA must be stricken as violating substantive due process on its face and as applied.

## II.    The AETA Violates Substantive Due Process

### A.    Ms. Kissane has a liberty interest in avoiding the misleading label of "terrorist"

Ms. Kissane has a liberty interest in avoiding prosecution under a "terrorism" law, because the language has practical and concrete consequences for their future liberty and livelihood, to say nothing of the power of the word to sway jurors. An

individual who is successfully prosecuted under the AETA will be known as a terrorist.  For example, in the press release describing Ms. Kissane's indictment, the U.S. Attorneys' Office used one or other form of the word "terrorism" no less than six times, including characterizing Ms. Kissane as "terrorizing the fur industry" and describing her alleged actions as "a form of domestic terrorism."  *See* News Release, Office of the United States Attorney Southern District of California: *Animal Rights Activists Accused of Going on Cross-Country Spree Targeting Fur Industry* (hereafter "Kissane News Release").[2]  The label carries obvious and significant stigma, which could impact Ms. Kissane's future employment, educational opportunities and personal relationships.

Moreover it has an impact on conditions of incarceration.  As "terrorists," federal prisoners convicted of AETA violations are eligible for placement in the Bureau of Prison's "communications management units."  These are especially restrictive and segregated prison units designed in part for prisoners whose "current offense(s) of conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism." *Aref v. Holder,* 953 F. Supp. 2d 133, 137 (D.D.C. 2013).[3]  For this reason, the court in *United States v. Johnson* assumed without deciding that the AETA's terrorism label infringed a non-fundamental right and should be subjected to rational basis review.  2015 WL 1058087, at *8-*10 (N.D. Ill. Mar. 5, 2015).

This liberty interest – the right not to have a misleading label attached to one's serious crime – has also been recognized outside the terrorism framework, particularly in the analogous context of challenges by individuals subject to sex

---

[2] Available at https://www.fbi.gov/sandiego/press-releases/2015/animal-rights-activists-accused-of-going-on-cross-country-spree-targeting-fur-industry.

[3] Other than the Federal Administrative Maximum Prison (ADX), communication management units "are the most restrictive facilities in the federal system." *Rezaq v. Nalley*, 677 F.3d 1001, 1009 (10th Cir. 2012).

offender registry requirements whose underlying crime involved no sexual component.  *See e.g., People v. Knox*, 903 N.E.2d 1149, 1151 (N.Y. 2010) ("the interest defendants assert is in not having their admittedly serious crimes mischaracterized in a way that is arguably even more stigmatizing, or more frightening to the community, than a correct designation would be. We do not hold this interest to be constitutionally insignificant"); *accord State v. Robinson*, 873 So. 2d 1205 (Fla. 2004); *see also*, *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 500 (6th Cir. 2007) (recognizing substantive due process interest in being free from being labeled a "*convicted* sex offender," when plaintiffs were never actually convicted of a sex offense).[4]

## B. Punishing non-violent property damage as "terrorism" is irrational and serves no legitimate government purpose

The AETA's prohibition on causing damage or loss to an animal enterprise (and Ms. Kissane's individual prosecution for allegedly releasing animals from fur farms and vandalizing property) are not crimes of terrorism, and cannot rationally be so labeled.  There is no legitimate rationale for calling "damag[ing] or caus[ing] the loss of any real or personal property (including animals or records) used by an animal enterprise," "terrorism."  While there is no single unifying definition of terrorism in federal or international law, *see* Nicholas Perry, *The Numerous Federal Legal Definitions of Terrorism: The Problem of Two Many Grails*, 30 J. LEGIS. 249

---

[4] Application of rational basis review in the sex offender registration context has led to mixed results, with some courts finding that mandatory sexual offender registration for non-sexual crimes is not rationally related to any legitimate legislative purpose, *see e.g., State v. Robinson*, 873 So. 2d 1205 (Fla. 2004); *ACLU of N.M. v. City of Albuquerque*, 137 P.3d 1215 (N.M. Ct. App. 2006); *State v. Reine*, 2003 WL 77174 at *4, 2003 Ohio 50, ¶ 23 (Ohio App. Jan. 10, 2003); and others holding that the legislature could rationally require sex offender registration for certain non-sexual crimes, such as kidnapping or false imprisonment of a minor, given that such a high percentage of these crimes are committed for a sexual purpose.  *See e.g., Knox*, 903 N.E.2d at 1153-1154; *State v. Smith*, 780 N.W.2d 90 (Wis. 2010); *People v. Johnson*, 870 N.E.2d 415 (Ill. 2007); *Moffitt v. Commonwealth*, 360 S.W.3d 247, 256 (Ky. Ct. App. 2012); *People v. Phillip C.*, 847 N.E.2d 801 (Ill. App. Ct. 2006).  Here, in contrast, there is no legitimate reason for punishing property loss directed at an animal enterprise as an act of terrorism.

1   (2004) (analyzing twenty-two definitions or descriptions of terrorism in federal

2   law); Sudha Setty, *What's In a Name? How Nations Define Terrorism Ten Years*

3   *After 9/11*, 33 U. PA. J. INT'L L. 1 (2011) (analyzing disparate international and

4   federal definitions of terrorism), there is "a consensus" that violence is a universal

5   component of it, *State v. Yocum*, 759 S.E.2d 182, 190 (W. Va. 2014) (citing

6   Nicholas J. Perry, 30 J. LEGIS. 249, 251 (2004)); *see also* ALEX P. SCHMID,

7   POLITICAL TERRORISM: A RESEARCH GUIDE TO CONCEPTS, THEORIES, DATABASES

8   AND LITERATURE 11 (1983) ("There is hardly a definition of terrorism that does not

9   contain the word 'violence'"); WALTER LAQUEUR, THE NEW TERRORISM 6 (1999)

10  ("perhaps the only characteristic generally agreed upon is that terrorism always

11  involves violence or the threat of violence"); *Johnson,* 2015 WL 1058087, at *9

12  (quoting the Oxford English Dictionary's definition of terrorism as "[t]he unofficial

13  or unauthorized use of violence and intimidation in the pursuit of political aims.").

14      Federal law, with the <u>*singular exception*</u> of the AETA, mirrors this

15  consensus.  *See, e.g.,* Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801(c)

16  (2000) (defining international terrorism as activities that "involve violent acts or

17  acts dangerous to human life" and "appear to be intended to intimidate or coerce a

18  civilian population" or the Government); USA PATRIOT Act, 18 U.S.C. § 2331

19  (5) (West Supp. 2003) (defining domestic terrorism identically); 18 U.S.C. § 2332b

20  (defining the crime of international terrorism to require violence or substantial risk

21  of serious bodily injury); The Homeland Security Act of 2002, Pub. L. No. 107-

22  296, 116 Stat. 2135 (2002) (defining terrorism to require activity "dangerous to

23  human life or potentially destructive of critical infrastructure or key resources").[5]

24

25  [5] Similarly, the federal terrorism sentencing enhancement allows for heightened
    penalties for all felonies that involve or are intended to promote "a federal crime of
26  terrorism." 18 U.S.C Appx § 3A1.4.  A "federal crime of terrorism" is defined as
    an offense "calculated to influence or affect the conduct of government by
27  intimidation or coercion, or to retaliate against government conduct" *that is also* a
    violation of certain enumerated federal laws, each of which involves violence or
28  damage to key infrastructure.  *See* 18 U.S.C. § 2332b.  Animal Enterprise Terrorism
    is not a qualifying offense for the terrorism enhancement.  *See id.*  This means that

1    Subsection (a)(2)(A) of the AETA prohibits causing damage or loss to real

2    or personal property.  Such conduct is not inherently, nor even likely to be, violent.

3    Past AETA prosecutions demonstrate this.  *See e.g., United States v. Viehl*, No. 09-

4    CR-119, 2010 WL 148398, at *1 (D. Utah Jan. 12, 2010) (AETA prosecution for

5    releasing 500 mink and spray-painting slogans); *United States v. Demuth*, No. 09-

6    CR-117 (S. D. Iowa Sep. 13, 2010), Dkt. No. 174 (plea agreement in AETA

7    prosecution for releasing ferrets from private business); *United States v. Johnson*,

8    No. 14-CR-390 (N. D. Ill. Oct. 1, 2014), Dckt. No. 41, at 2 (AETA prosecution for

9    releasing mink belonging to a private company, pouring an acidic substance on two

10   trucks, and spray-painting "Liberation is Love").  So do the allegations against

11   Ms. Kissane.  *See* Indictment, Dckt. No. 1 (describing multiple road trips in which

12   Defendants are alleged to have released mink from mink farms and vandalized

13   property).  Calling the type of non-violent property crimes "terrorism" at issue in

14   this case is irrational, and serves no legitimate purpose.

15   Subsection (a)(2)(B)'s prohibition of some conduct, like violence and

16   intimidation, which could conceivably fit the definition of terrorism, does not alter

17   the conclusion that the Act as a whole violates substantive due process.  Irrespective

18   of (a)(2)(B), the law is not solely or even *primarily* aimed at violent or intimidating

19   conduct.  Indeed, in the decade it has existed, the AETA has not yet been used to

20   prosecute a single act of physical violence against a human being.  Given this

21   history, it is fair to assume that the "vast majority" of AETA prosecutions will

22   continue to bear absolutely no relation to terrorism.  *See Cornwell v. Calif. Bd. of*

23   *Barbering and Cosmetology*, 962 F. Supp. 1260, 1273 (S.D. Cal. 1997).  It is not

24   rational to call non-violent property damage "terrorism" simply because it is

25   conceivable that some act of terrorism might theoretically be punished under the

26   law in the future.

27

28

under federal law, the AETA both is and is not a crime of terrorism.

As one Ohio appellate court reasoned:

> [i]magine that the General Assembly, desiring to enable the public to protect itself from the risks represented by convicted felons living within their midst, were to enact a statute designating all persons convicted of felonies as "murderers," with registration and reporting requirements, so that neighbors would wind up being advised that John Jones, a "murderer," is now living on their block. John Jones is, in fact, a person who has been convicted of an esoteric election-law felony. It is the misnaming, or mis-characterization, of the offense, that is unreasonable and arbitrary.

*State v. Reine*, 2003 WL 77174 at *4, 2003 Ohio 50, ¶ 23 (Ohio App. Jan. 10, 2003). *Some* felons are murderers; this does not make it rational to label *all* felons "murderers." Terrorism, like murder, is a word that "the average person can be expected to understand" as referring to something specific and egregious. *Id.* Applying a label like "terrorism" to vandalism and other property offenses "confounds this ordinary understanding of the words used," is unreasonable and arbitrary. *See id.* Indeed, true terrorism is "trivialized if the terminology is applied loosely in situations that do not match our collective understanding of what constitutes a terrorist act." *People v. Morales*, 20 N.Y.3d 240, 249 (2012). Accordingly, the AETA violates substantive due process rights on its face and as applied in this case.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the indictment against Ms. Kissane.

Respectfully submitted,

Dated:  July 19, 2016

*/s/ John C. Ellis, Jr.*
Federal Defenders of San Diego, Inc.
Attorneys for Ms. Kissane

Email:  John_Ellis@fd.org

## **CERTIFICATE OF SERVICE**

Counsel for the Defendant certifies that the foregoing pleading has been electronically served on the following parties by virtue of their registration with the CM/ECF system:

John M. Parmley
Assistant U.S. Attorney

Michael F. Kaplan
Assistant U.S. Attorney

Respectfully submitted,

Dated:  July 19, 2016

/s/ John C. Ellis, Jr.
Federal Defenders of San Diego, Inc.
Attorneys for Ms. Kissane

Email:  John_Ellis@fd.org

MOTION TO DISMISS INDICTMENT FOR VAGUENESS